# EXHIBIT A

# FEDERAL COMMUNITY DEFENDER OFFICE
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FEDERAL COURT DIVISION DEFENDER ASSOCIATION OF PHILADELPHIA

601 Walnut Street, Suite 545 West
Philadelphia, PA 19106

**MAUREEN KEARNEY ROWLEY**
Chief Federal Defender

PHONE NUMBER (215) 928-0520
FAX NUMBER     (215) 928-0826
FAX NUMBER     (215) 861-3508

October 31, 2005

Mr. Terry Marcus Henry
US DEPARTMENT OF JUSTICE
P.O. Box 883
20 Massachusetts Avenue, NW
Room 7144
Washington, DC 20529-0001

**RE:   TOHIRJANOVICH V. BUSH**
**1:05-cv-00994**

Dear Mr. Henry:

On October 14, 2005, we were appointed to represent the Petitioner, Kasimbekov Komoliddin Tohirjanovich, in the above-captioned case. Our entry of appearance was entered on October 28, 2005.

We have learned from press accounts that there is a hunger strike at Guantanamo Bay. We request that you kindly provide us any information on whether our client is participating in the hunger strike. We also request also request information on whether our client has been force fed and that you provide any other non-classified information to us in reference to our client as soon as possible.

We would greatly appreciate any response to this correspondence by Friday, November 4.

Thank you in advance for your kind consideration.

Sincerely,

Billy H. Nolas
Assistant Federal Defender

# EXHIBIT B

# U.S. DEPARTMENT OF JUSTICE

Civil Division
Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, D.C. 20530
Fax: 202-616-8470

## Facsimile Transmission Cover Page

**DATE** _November 4, 2005_

**TO** _Billy Nolas_

FAX NO. _215 - 928 - 0826_

**FROM** _Andrew Warden_

NOTE: _re: Tohirjanovich v. Bush, 05- 994 (JDB) (D.D.c )_

TOTAL # PAGES *(INCLUDING COVER SHEET)* _15_

The information contained in this facsimile message is intended exclusively for the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are advised that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone.



**U.S. Department of Justice**
Civil Division
Federal Programs Branch
20 Massachusetts Ave., NW
Washington, D.C. 20530

---

Andrew Warden                              Tel:   (202) 616-5084
Trial Attorney                             Fax:   (202) 616-8470
                                           Email: andrew.warden@usdoj.gov

November 4, 2005

<u>VIA FACSIMILE – (215) 928-0826</u>

Billy H. Nolas
Assistant Federal Defender
Federal Community Defender Office For The Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106

   Re: <u>Tohirjanovich v. Bush</u>, Civ. A. No. 05-994 (JDB)

Dear Mr. Nolas:

   I am writing in response to your October 31, 2005 letter addressed to Terry Henry, which requests information regarding petitioner Kasimbekov Komoliddin's alleged involvement in a hunger strike at Guantanamo Bay.

   We cannot agree to your various requests for information. As we have explained in public filings, however, personnel at Guantanamo are actively involved in monitoring the health status of any detainee who is fasting or participating in a hunger strike, in addition to the normal quality medical care provided to detainees. Security personnel monitor each detainee's daily intake of meals and water. If it is determined that a detainee has missed all meals over three days or has declined food and water for more than two days, medical personnel conduct a medical evaluation of the detainee and then monitor him on a regular basis. If there is reason to believe that the fast or hunger strike could endanger the detainee's health or life, he is admitted to the detention hospital for continued monitoring and counseling regarding the risks associated with not eating. Involuntary medical treatment, such as IV hydration, is administered if the detainee reaches a point where continued fasting would seriously threaten the detainee's life or health. <u>See</u> attached Declarations of Gen. Jay Hood (originally filed in, <u>inter alia</u>, <u>El Banna v. Bush</u>, 04-CV-1144-RWR; Sept. 9, 2005) and Dr. John Edmondson (originally filed in, <u>inter alia</u>, <u>Al Joudi v. Bush</u>, 04-CV-301-GK; Oct. 19, 2005).

   The situation with regard to whether any particular detainee may be missing meals or be in the detainee hospital is somewhat dynamic and may change from day-to-day. Guantanamo personnel are not in a position to provide continuous updates on that situation to you or, potentially, counsel for the more than 200 other habeas petitioners at Guantanamo. As noted

above, however, Guantanamo is appropriately monitoring and providing medical treatment as
warranted to preserve detainees' lives and health.

Sincerely,

Andrew I. Warden

Attachments (Hood Declaration & Edmondson Declaration)

## DECLARATION OF MG JAY W. HOOD

Pursuant to 28 U.S.C. § 1746, I, JAY W. HOOD, hereby declare under penalty of perjury under the laws of the United States that to the best of my knowledge, information, and belief, the following is true, accurate, and correct:

1. I am a Major General in the United States Army, with 30 years of active duty service. I currently serve as Commander, Joint Task Force-Guantanamo, Guantanamo Bay, Cuba (JTF-GTMO). I have served in that position since March 2004. JTF-GTMO conducts detention and interrogation operations in support of the Global War on Terrorism, coordinates and implements detainee screening operations and supports law enforcement and war crimes investigations. Our detention mission is conducted in a humane manner that protects the security of both detainees and JTF personnel at GTMO. In my capacity as Commander, I am responsible for all aspects of detainee operations at Guantanamo Bay, Cuba to include medical care and I oversee the operation of the detention hospital that provides medical care to the detainees being held at Guantanamo. Currently, there are in excess of 500 detainees being held at Guantanamo Bay, Cuba.

2. Consistent with Department of Defense policy the JTF will prevent unnecessary loss of life of detainees through standard medical intervention, including involuntary medical intervention when necessary to overcome a detainee's desire to commit suicide, using means that are clinically appropriate. Although the principles of autonomy and consent for medical treatment are well established in medical care and are applicable to detainees, there are also clearly recognized exceptions in areas such as communicable disease treatment, occupational health, and

prison medical care, especially to prevent unnecessary loss of life.

3. The U.S. Department of Justice regulations for the Bureau of Prisons (Title 28 of the Code of Federal Regulations, Section 549.65) establishes explicit procedures for involuntary feeding of prison inmates engaged in hunger strikes when necessary to prevent an imminent threat of death or permanent impairment. That program was used as the model for Department of Defense detainee program operations in this area discussed in this declaration.

4. In keeping with the above guidance, it is JTF-GTMO's standard operating procedure (as approved by the Deputy Assistant Secretary of Defense – Detainee Affairs and the Assistant Secretary of Defense – Health Affairs) to avert death from hunger strikes and failure to drink, as well as to monitor the health status of detainees who are fasting voluntarily. Every attempt will be made to allow detainees to remain autonomous up to the point where failure to eat or drink might threaten their life or health.

5. Security forces at JTF-GTMO monitor each detainee's daily intake of meals and water. If a detainee has missed nine consecutive meals or has declined food and water for more than two days, personnel at the detention hospital are notified and a medical evaluation of the detainee is conducted. This evaluation includes a complete medical records review, as well as physical and mental health examinations and testing. Medical personnel on a regular and frequent basis then monitor the detainee.

6. If medical personnel have reason to believe that the continuation of a voluntary fast or hunger strike could endanger a detainee's health or life, the detainee will be admitted to the detention hospital. His food and water intake are again monitored, and his medical condition is

2

continuously observed. Medical Staff counsel the detainee regarding the risks associated with not following our medical advice directing him to eat life-sustaining food and to drink fluids. We also explain the alternatives available to him, including oral food and fluid, oral rehydration solutions, oral nutritional supplements and intravenous hydration.

7. If the detainee elects to voluntarily begin eating/drinking, the detention hospital follows specific protocols designed to ensure the detainee's health and well being as he increases his caloric and liquid intake.

8. If the detainee continues to refuse to eat and/or drink and if a medical officer determines that the detainee's health or life might be threatened if treatment is not initiated immediately, consideration is given to involuntary medical treatment of the detainee. Interventions of an involuntary manner are deferred, however, until there is a clear medical determination by the attending physician that continued fasting would impair the health seriously or jeopardize the life of a detainee. When, after reasonable efforts, or in an emergency preventing such efforts, a medical necessity for immediate treatment of a life or health threatening situation is determined by the physician to exist, I will authorize doctors to administer treatment without the consent of the detainee. This can include the use of intravenous means or a feeding tube. No request for such authorization has been denied, and where sought, such authorizations have been provided in a timely manner without exacerbating the medical situation of a detainee.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  9 September 2005

_____
JAY W. HOOD
Major General, USA

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAJID ABDULLA AL JOUDI, *et al.*, ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 05-0301 (GK) |
| ) | |
| GEORGE W. BUSH, ) | |
| President of the United States, *et al.*, ) | |
| ) | |
| Respondents. ) | |

| | |
|---|---|
| JARALLAH AL-MARRI, *et al.*, ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 04-2035 (GK) |
| ) | |
| GEORGE W. BUSH, ) | |
| President of the United States, *et al.*, ) | |
| ) | |
| Respondents. ) | |

| | |
|---|---|
| MUHAMMAD AL-ADAHI, *et al.*, ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 05-280 (GK) |
| ) | |
| GEORGE W. BUSH, ) | |
| President of the United States, *et al.*, ) | |
| ) | |
| Respondents. ) | |

HAMID AL RAZAK,, *et al.*,      )
                                  )
                   Petitioners,      )
                                  )
         v.      )      Civil Action No. 05-1601 (GK)
                                  )
GEORGE W. BUSH,      )
President of the United States, *et al.*,      )
                                  )
                   Respondents.      )

## DECLARATION OF JOHN S. EDMONDSON, M.D.

Pursuant to 28 U.S.C. § 1746, I, John S. Edmondson, hereby declare:

1.      I am a Captain in the United States Navy with 25 years Active Federal Commissioned Service. I currently am the Commander, US Navy Hospital, Guantanamo Bay, Cuba and also serve as the Task Force Surgeon for Joint Task Force-Guantanamo, Guantanamo Bay, Cuba (JTF-GTMO). I am directly responsible for the medical care provided to personnel living at Guantanamo Bay and oversee the operation of the detention hospital that provides medical care to the detainees being held at Guantanamo. Currently, there are in excess of 500 detainees being held at the detainee camp at Guantanamo Bay, Cuba.

2.      I received my medical degree from the Medical College of Georgia. I completed an Internship at Bethesda Naval Hospital and a Residency in Emergency Medicine at Naval Hospital San Diego. I am licensed to practice in California and Georgia. I have held teaching appointments at the University of California San Diego and the Uniformed Services University of the Health Sciences in Bethesda.

3.      As the supervisor in charge of the detention hospital for JTF-GTMO, I regularly visit the detention hospital and I am in contact with the physician who is the Officer-in-Charge of the

2

detention hospital many times daily. I have personal knowledge of the procedures that are in place

for the operation of the detention hospital and I am responsible for ensuring they are followed. I

have personal knowledge of, or have received information in the course of my responsibilities

concerning, the matters related to the allegations made by petitioners' counsel in their September 28,

2005 motion to compel access to counsel and the exhibits submitted with it.

    4.      There are procedures and/or protocols for providing medical care to detainees

including those detainees who may be participating in a hunger strike. The framework for these

procedures are set forth in the JTF-GTMO Standard Operating Procedures, the orders of JTF

Commander, Major General Jay Hood, and the orders of higher military and medical authorities.

These procedures were generally set forth in the declaration of Major General Hood previously

submitted in these cases. These orders and procedures establish the practices to be followed at all

times by all medical personnel at the detention hospital and throughout JTF-GTMO.

    5.      No patient at the detention hospital receives any medical treatment, to include the

insertion of nasogastric tubes, feeding through those tubes, the administration of medication and the

hydration of patients from anyone other than a physician or a credentialed registered nurse. While

medical corpsmen may assist in a procedure, none of the above-listed medical procedures are

performed or have ever been performed by medical corpsmen, physician assistants or anyone other

than these medical professionals. This practice equals or exceeds the standard of care available at

accredited hospitals in the United States.

    6.      When inserting nasogastric tubes, a lubricant is always used. In all cases, a topical

anaesthetic such as lidocaine is offered; however, a patient may decline the anaesthetic. A sterile

nasogastric tube is lubricated with a gel that contains lidocaine, a widely used local anaesthetic, or

surgilube prior to its insertion by the medical professional. In rare cases, cetacaine, an oral spray,

3

may also be used. Sedation, which creates greater risks to the patient, has never been required to accomplish a nasogastric tube insertion. A nasogastric tube is never inserted and moved up and down. It is inserted down into the stomach slowly and directly and it would be impossible to insert the wrong end of the tube. I have personally performed this insertion procedure for some of the hunger-striking patients. Medical personnel do not insert or administer nasogastric tubes in a manner intentionally designed to inflict pain or harm on the detainee.

   7.  Contrary to petitioner's counsel's assertions, no detainee participating in the hunger strike has ever been placed in six-point restraint to receive intravenous medication. Only rarely are detainee patients unwilling to have the nasogastric tubes inserted. On only one occasion has a detainee patient been placed in a six-point restraint to receive a nasogastric tube and within minutes of placement the restraint level was reduced to two-point restraint, which would allow the detainee to remove the tube if he chose. In less than ten cases have trained medical personnel had to use four-point medical restraint in order to achieve insertion. Guards have never inserted, removed or even touched nasogastric tubes. When any of these medical restraints are necessary, only soft Velcro restraints are used. Virtually all of the detainee patients accept insertion of nasogastric tubes without any additional restraints.

   8.  Current protocols require that a new sterile nasogastric tube be utilized for every insertion. An earlier protocol used in the detention hospital allowed a sanitized feeding tube to be reused for the same detainee only, however that protocol, although consistent with standard, approved medical practice, was changed after only two days. Nasogastric tubes are not and were not ever inserted in one patient and then used again in another patient.

   9.  Currently only 10 french (3 mm. in diameter) nasogastric tubes are used on all patients. Originally, 12 french (3.6 mm in diameter) tubes were used for most detainees receiving daily feedings. During a two-day period in September, 2005, 16 french (4.8 mm in diameter) tubes were used for a few patients when medical personnel at the detention hospital attempted to

implement a U.S. Bureau of Prisons protocol for higher volume feeding that would allow the detainees to remain in their cells for more of the day. This protocol involved the insertion of the feeding tube twice per day, with the tube being sanitized before each insertion, but the protocol was abandoned after a two-day trial period, as it was determined that a protocol involving smaller tubes which remained in the patient for longer periods of time was more comfortable for the patients and was easier to manage for medical personnel. The 3 mm tubes are soft and flexible, and are in common use as nasogastric tubes in hospitals throughout the United States.

10.     Doctors and registered nurses carefully and continuously evaluate the health of all detainees being tube-fed. First, consistent with JTF-GTMO policy, detainees are counseled concerning the risks of not eating and alternatives to involuntary feeding. The counseling occurs on multiple occasions, including when a detainee has refused nine consecutive meals, prior to the onset of tube feeding, and at various times during the period of time the detainee chooses to be tube fed. Doctors and nurses monitor the detainees' health by both observation and medical testing. Each patient has a different ability to accept differing amounts of nutrition and hydration. As a result, medical professionals must continually evaluate the rates of nutrition and hydration and make observations on the success of the treatment regimen. In addition, blood tests are taken on a periodic basis and that laboratory data is also evaluated.

11.     Depending upon the location of the detainees, those that are hunger-striking get varying degrees of medical supervision. Those detainees that are patients in the detention hospital have a registered nurse and other medical personnel on site twenty four hours every day and are seen by a physician no less than once daily.   For those detainees on Papa block, the special cell block for detainees who are being fed enterally, they have no restraints in their cells, are able to exercise daily and have a physician or registered nurse on site all day, every day. Those detainees who are not

5

receiving enteral feeding are seen daily by corpsmen, and can be seen anytime they request medical assistance through the guards.

12.     When a detainee under medical care is transported to Camp Echo, he may be transported in various types of vehicles. Before allowing the detainee to be moved to Camp Echo, medical personnel evaluate the detainee's condition at the time to determine that the detainee can be moved safely and without compromise of his medical condition. In some cases, an ambulance is used. On two occasions, an ambulance and stretcher were used because wheelchairs and wheeled walkers are difficult to use on the gravel pathways at Camp Echo. On only one occasion was a corpsman detailed to accompany the patient to Camp Echo and remain in the area if needed. This precaution was based on the detainee's medical status as evaluated at the time.

13.     In some cases an intravenous route is used for re-hydrating hunger striking patients that are not to the point that they need enteral feedings. As the condition of each detainee patient is evaluated, a medical professional may determine that hydration is necessary. This treatment, performed in the detention hospital is, again, always done by either a registered nurse or a doctor. As with any intravenous treatment, minor local swelling does occur from time to time, but there have been no medical complications from any intravenous feeding of a hunger-striking detainee. Once the detainees are on enteral feedings, all hydration that is necessary can be provided through the feeding tube.

14.     Experience teaches that, whenever nasogastric tubes are used, there may be occasional minor bleeding and nausea as a result. This medical procedure requires that a foreign object be inserted into the body and, ideally, remain in it. The patients are all offered pain relievers if they are in discomfort. Many patients do not request or need pain relievers. If required, non-narcotic pain relievers such as ibuprofen are usually sufficient. In rare instances, narcotic pain relievers have been used. During the course of the entire hunger strike, there have not been any serious problems or

6

complications, including any serious bleeding or vomiting, from the utilization of the nasogastric feeding tubes. Occasional sores may occur in the throat, but those sores have not been severe and have been treated. The sores have not kept the patients from talking or otherwise functioning within the camp or the detention hospital. In all of the procedures done in order to feed patients enterally during the hunger strike, only one patient has passed out, and that was due to hyperventilation. That patient, who is not one of the petitioners, had no long-term impact from fainting.

15.     The actual feeding process, both at the detention hospital and on the cell block, is very voluntary. Detainees retain a large measure of control over the administration of the nutrition. Once the feeding tube is inserted (or if it has remained in the detainee) a bag is connected to the tube and the nutrition flow begins. The detainee himself controls the flow of the nutrition so that any discomfort is minimized. The entire feeding process for most detainees takes approximately two hours. The feeding process on the cell block is similar. The detainees within their cells come voluntarily to the door and hand their nasogastric tube out to a nurse, who connects the bag of nutrition to the tube and hangs the bag connected to the tube on a hook outside the cell door. Then the detainee initiates and controls the flow of nutrition until the feeding is completed. The length of the tube allows the detainee to move about within his cell during the two hours of feeding. During Ramadan, just as with regular meals provided to other detainees, the enteral feedings for hunger strikers are done before dawn and after sunset to accommodate any detainee's desire to maintain his religious fast.

16.     On October 1, 2005, after meeting with his lawyer earlier in the day, ISN 114 removed his feeding tube and incited seven other detainees on Papa block with feeding tubes to do the same. As an explanation for why he removed his feeding tube, ISN 114 reported that his lawyer told him that the government does not have any right to force feed the detainees. In response to this situation, which created significant problems on the cell block, on October 2, 2005, one of my physicians met with the

7

detainee patients and explained again why involuntary feeding was being done and that the involuntary feeding was authorized through a lawful order of a higher military authority. Additionally, the physician provided one detainee who could speak and read English a copy of a recent court order that cited the procedures outlined in General Hood's declaration with approval.

17.     At one point during September, 2005, ISN 114 was moved to the new, as of yet unoccupied, psychiatric wing of the detention hospital. This move was done only because there was a need for space within the hospital and the psychiatric wing is an available overflow medical care facility within the camp. With regard to the specific condition of ISN 114, he is stable and his prognosis is good. He has been a hunger striker since 11 August and has been fed enterally since 25 August 2005. He now resides on Papa block, has no restraints in his cell and voluntarily leaves his feeding tube in place. Previously, he had been in the detention hospital and was released and returned to the cell block with his feeding tube removed for two days in September in an effort to encourage him to eat. He was offered food and water during that time. However, after refusing to eat for two days, ISN 114 was returned to the detention hospital, re-hydrated and his enteral feeding was then resumed. While ISN 114 has had demonstrable weight loss due to his choice to participate in the hunger strike, he has had no serious complications and is able to talk, walk and even participates in scheduled recreation three times per week.

18.     I am also familiar with the condition of ISN 440. He, too, is stable and his prognosis is good. He chose to participate in the hunger strike on 9 August and has been fed enterally since 25 August. Although he, too, has had a demonstrable weight loss due to his choice to hunger strike, 440 is still capable of all necessary physical activity, including incidents when he has stood on his bed and shouted derogatorily at medical personnel on the same day that he was reported by his counsel to be unable to walk or talk.

8

19.    Guards are not permitted to, and do not, physically or verbally harass the detainee patients receiving enteral feedings, either in the detention hospital or on the cell block. Their presence in the detention hospital is solely to ensure the safety and security of both the detainees and medical staff. For all detainees, medical care that is needed is never withheld to gain cooperation or for any other reason.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: October 19, 2005

JOHN S. EDMONDSON, M.D.

9

# EXHIBIT C

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

FILED WITH
COURT SECURITY OFFICER
10/13/05
DATE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MAJID ABDULLA AL JOUDI, *et al.*,

Petitioners/Plaintiffs,

v.

GEORGE W. BUSH, *et al.*,

Respondents/Defendants.

Civil Action No. 05-0301 (GK)

## SUPPLEMENTAL DECLARATION BY JULIA TARVER, ESQ.

I, Julia Tarver, declare that the following statements are true to the best of my knowledge, information, and belief:

1.   I am a member of the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for Petitioners in the above-captioned action.  I offer this Supplemental Declaration in further support of Petitioners' Motion to Compel Access to Counsel and Information Related to Medical Treatment.

2.   From September 30 to October 2, 2005, my colleagues and I visited ten clients at Guantánamo on a previously-scheduled visit to the detention center. As soon as we arrived at the camp on Friday morning, we were informed by Lt. Commander De Alicante of the Staff Judge Advocate group, that, as we had feared, at least two of our clients were participating in the hunger strike, and both were currently being involuntarily force-fed through tubes inserted from their noses into their stomachs.

3.   De Alicante told us that Yousef Al Shehri — our client who was taken prisoner by the American military while still a juvenile — was imprisoned in a

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

regular military cell, where he was being fed in the morning and in the afternoon through the tube in his nose. When I inquired as to why he was not hospitalized, De Alicante informed me that he is able to receive his daily feedings while he is in his cell.

4.    De Alicante told us that another client, Abdul-Rahman Shalabi, was being involuntarily fed through his nose, as well, but that his condition had deteriorated to the point that he was being held in the camp hospital. Later that day, De Alicante told us that he had spoken to the doctor at the camp hospital, and the doctor thought that by Sunday Abdul-Rahman would be able to be brought over by ambulance to Camp Echo, where all attorney-client visits take place. When we inquired as to whether such a transfer would be in Abdul-Rahman's best interest, and whether we could instead meet with our client in the hospital where he was being treated, De Alicante emphatically refused, stating that if Abdul-Rahman was not well enough to come to Camp Echo, we would not be permitted to see him.

*Yousef Al-Shehri*

5.    On Saturday, October 1, we were permitted to see our young client, Yousef Al-Shehri, for the first time since our visit in late July. His condition – physically, mentally, and emotionally – had drastically deteriorated in the interim.

6.    As indicated in my previous Declaration in support of this motion, Yousef had ended his previous hunger strike in July because he was told by high-level military officers that he would be released in no less than three weeks' time and that conditions in the camp would be improved for all detainees. When these promises were broken, Yousef, along with many other prisoners, reinstituted his hunger strike in an act of obvious desperation.

2

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

7.    When we saw him on Saturday morning, Yousef was emaciated and had lost a disturbing amount of weight (even when compared with our last visit, when we had seen him only the day after he had discontinued his first hunger strike). This twenty-one year-old client was visibly weak and frail, and was seated in a chair behind a walker, on which he frequently leaned for balance during the interview. He had difficulty speaking because of lesions in his throat that were a result of the involuntary force-feeding he had been receiving through his nose and throat. He held the nasal-gastric ("NG") tube away from his mouth in order to speak, and he winced with pain on more than one occasion as we talked with him. His speech was slow and labored – a drastic difference from the young boy we first met in May of this year.

8..    Yousef told us that the second hunger strike began on August 8, shortly after we had last seen him. After approximately seven days without any food or water, Yousef and four other prisoners were taken to a special detainee wing at Guantánamo's military/civilian hospital, away from the detainee camp. At the hospital, he and the other detainees were verbally abused and insulted and were restrained from head to toe. They had shackles or other restraints on their arms, legs, waist, chest, knees and head. With these restraints in place, they were given intravenous medication (often quite painfully as inexperienced medical professionals seemed incapable of locating appropriate veins). Their arms were swollen from the multiple attempts to stick them with IV needles. Yousef told us that if the detainees moved, they were hit in the chest/heart. He said that one detainee fainted after such treatment, and that the doctors gave him a shot and he woke up in an hour.

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

9.      After some time in the hospital, a medical team from the United States mainland arrived and informed the detainees they were going to be fed involuntarily. The detainees were told that the Court had ordered such forced-feeding.[1]

10.     Yousef was the second detainee to have an NG tube inserted into his nose and pushed all the way down his throat and into his stomach, a procedure which caused him great pain. Yousef was given no anesthesia or sedative for the procedure; instead, two soldier restrained him – one holding his chin while the other held him back by his hair, and a medical staff member forcefully inserted the tube in his nose and down his throat. Much blood came out of his nose. Yousef said he could not speak for two days after the procedure; he said he felt like a piece of metal was inside of him. He said he could not sleep because of the severe pain.

11.     After two or three days, Yousef was given large amounts of Ensure (a liquid nutrition supplement) through the tube in his nose. Yousef told the doctors that it was too much food, but the doctors gave it to him anyway, and it made him vomit repeatedly. He and other prisoners were vomiting up substantial amounts of blood. When they vomited up blood, the soldiers mocked and cursed at them, and taunted them with statements like "look what your religion has brought you."

---

[1] Yousef was greatly disturbed to hear from us that there was no such court order of which we were aware. While we explained that there may be other orders of which we were unaware, Yousef said that he and the others were only complying with the nasal tube feeding because they believed it had been ordered by this Court. While, for the reasons subsequently explained, we were not able to meet with Yousef a second time on our visit, we were told by the staff at Guantanamo that shortly after our meeting with Yousef, he removed his NG tube and encouraged fellow detainees to do the same because they had been lied to about the presence of an order requiring their force-feeding.

4

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

12.    After two weeks of this treatment, with little nutrition and virtually no sleep, the prisoners were transferred back to Camp Delta and placed in solitary cells on the ██████ Block. According to Yousef, they stayed there for five days *without any food or water*, including without any involuntary feeding through the NG tubes. During this time, they were subjected to various forms of psychological torture: soldiers laughed and made fun of them, rattled the metal bars on their cells at all times of the day and night, interrupted their prayers, and refused to allow the ill detainees sleep, all in an effort to get them to stop the hunger strike.

13.    Finally, after five days, the detainees were transferred to a location they described as being for the mentally disturbed. In this area, the walls were made of foam, and there were strange lights and a hole in the floor in which to urinate. It was in this location that the guards first began to insert larger, thicker tubes into the detainees' noses.

14.    These large tubes – the thickness of a finger, he estimated – were viewed by the detainees as objects of torture. They were forcibly shoved up the detainees' noses and down into their stomachs. Again, no anesthesia or sedative was provided to alleviate the obvious trauma of the procedure. Yousef said that he could not breathe with this thick tube inserted into his nose (which, when inserted, was so large it caused his nostril to distend). When the tube was removed, it was even more painful, and blood came gushing out of him. He fainted, and several of the other detainees also lost consciousness. The detainees were told by the guards: "we did this on purpose to make you stop the hunger strike." They were told that this tube would be inserted and removed

5

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

twice a day every day until the hunger strike ended. Yousef described the pain as "unbearable."

15.    Yousef explained that doctors were present as the riot guards at Guantánamo (called the Initial Reaction Force ("IRF")) forcibly removed these NG tubes by placing a foot on one end of the tube and yanking the detainee's head back by his hair, causing the tube to be painfully ejected from the detainee's nose. When the detainees saw this happening, they begged to have the tubes remain, but the guards refused and continued to forcibly remove the tubes.

16.    Then, in front of the Guantánamo physicians – including the head of the detainee hospital – the guards took NG tubes from one detainee, and *with no sanitization whatsoever*, re-inserted it into the nose of a different detainee. When these tubes were re-inserted, the detainees could see the blood and stomach bile from other detainees remaining on the tubes. A person the detainees only know as "Dr. ██"[2] stood by and watched these procedures, doing nothing to intervene.

17.    Yousef's psychological and mental condition is commensurate with his rapidly failing health. He has an absolute determination to die, and feels greatly betrayed by the false promises given to him by the American government, acting through the military. Yousef explained: "after the first strike, they gave us promises. They said we will respect you and your religion and we will give you your rights. They promised me I would be freed. They promised many detainees they would be released. We

---

[2] Yousef described "Dr. █" as the "head of the torture team." He estimated that Dr. █ was approximately ███████ tall, with ████ hair. He said he appeared to be in his ██████, and worse a ███████ and a ████████. Yousef believed he was a member of the ████, with a ████████ on his uniform. A similar description of Dr. █ was provided by another client.

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

waited, but they did not deliver. Instead, they disrespected us and our religion, they threw the Koran on the floor and stripped us naked." Young Yousef asked us more than once to try to explain to him why America would do this to him. "What did I do wrong to America?" he cried.[3]

18.    Yousef can no longer walk. He has lost some of his vision, and he is vomiting every day, including the day we visited him. He has severe headaches, and great pain in his ear. He is only able to urinate once every few days (raising serious questions about his level of hydration). He is being held in a regular camp cell block, with no medical supervision, except for the brief period(s) during the day when a medic comes by and hooks his NG tube up to a feeding bag for a short time. He has given us his last will and testament, as he fully anticipates that he is going to die.

19.    On October 1, the day that we saw Yousef, he had been on the hunger strike for a staggering 55 days. As of October 14, his hunger strike will likely have reached 68 days. Yousef told us that he knew of at least 21 individuals who were being fed through their noses by the U.S. military. He stated that "another 15 were on the way."

20.    When we left Yousef on Saturday, we were supposed to see him again the following day, on Sunday, October 2, in part so that we could allow him to listen to an audio DVD of a message from his mother encouraging him to work with us on his legal case and not to lose hope. However, on Sunday morning, we were told that,

---

[3]    Yousef also told us that just five days before our visit – at the same time he was receiving supposedly life-saving forced feeding through his nose – he was subjected to an Administrative Review Board proceeding, designed to determine what, if any, level of threat he posed to the United States. We were not provided any notice of

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

despite the exigent circumstances, we would not be able to play this message for Yousef because while the Government had no problem with the accuracy of the transcription we provided, they were concerned that there might be hidden messages or other material embedded in this tape from Yousef's mother (much of which consists merely of the sound of a weeping mother's voice).

21.    In addition, once we arrived at the Echo camp on Sunday, the military officials told us that Yousef had "refused our visit." We asked permission to see Yousef to understand why he was refusing our visit, given that he had always met with us before and we had left the previous day with the understanding we would see him again on Sunday. Permission was denied. We were simply told that we would not be able to see him again.

22.    This denial is especially troubling in light of a fact that we learned on this same visit from another client, Majid Al Joudi, who told us that when we visited in July, he was on a hunger strike and was never even notified that we had come to see him, as we had promised. He said that, contrary to what we had been told by the Staff Judge Advocate's office when we were at Guantánamo in July, he had *never* refused our visits or refused our mail. We also learned from numerous clients that the detainees are often not even told why they are being moved when they are brought to Camp Echo for an attorney-client visit, and the military confirmed that no Arabic interpreters are present when the guards remove the prisoners and bring them to Echo. In light of all of this, we are deeply troubled that we were denied a second opportunity to meet with Yousef, as

---

such a proceeding, and certainly object to its being conducted at a time when our client is clearly in poor mental and physical condition.

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

requested.

### *Majid Al Joudi*

23.     On September 30, 2005, we met with Petitioner Majid Al Joudi.
He had previously participated in the hunger strike in July to the point where he was fed
intravenously and was, at the time we saw him in September, just beginning to participate
in the second hunger strike.  He said he had taken a pledge to die, and that many others
were joining him in the strike.  He, too, gave us his last will and testament.

### *Abdul-Rahman Shalabi*

24.     On October 2, 2005, we met with another Paul, Weiss client,
Abdul-Rahman Shalabi, whose habeas case is currently before Judge Urbina of this
Court.  Like Yousef, Abdul-Rahman appeared gaunt and emaciated.  He had an NG tube
inserted in his nose and was seated in a wheelchair when we arrived.  Abdul-Rahman is
5' 8" tall, and prior to his participation in the hunger strike, he weighed approximately
143 pounds.  He told us that two weeks *prior* to our meeting, his weight had already
dropped to 111 pounds.

25.     Abdul-Rahman was brought over to Camp Echo for our meeting in
an ambulance, where he was carried across the gravel camp on a stretcher, and then
brought inside the cell and transferred to a wheelchair (with handcuffs).  There was a
purplish/reddish hue to his forehead and he appeared incredibly weak.  His speech was
also slow and labored.

26.     Virtually everything Yousef described to us about his treatment
was independently confirmed by Abdul-Rahman's description of his own treatment by

9

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

the military. Each described the use of medical intervention as a form of torture, perpetrated by medical and other personnel at Guantánamo.

27.    Abdul-Rahman, too, told us of tubes bigger than his finger being forced into his nose, so that he could not breathe and ultimately passed out. He, too, told us of wounds in his throat and nose from the repeated forcible insertion and removal of these tubes by, among others, riot team guards. He told us of begging for anesthesia or sedatives that were denied. He told us the guards would deliberately stick the tubes in the wrong way in order to torment the detainees and hopefully persuade them to discontinue their hunger strike. He described excessive bleeding from his nose and mouth. He, too, described Dr. ▆ and told us of Dr. ▆'s participation in, and supervision of, these practices.

28.    In addition, Abdul-Rahman told us that one Navy doctor came and put the tube in his nose and down his throat and then just kept moving the tube up and down, until finally Abdul-Rahman starting violently throwing up blood. Abdul-Rahman tried to resist the "torture" from this physician, but he could not breathe. He was suffocating, and when the tube that had been jabbing him internally was finally removed, it was full of blood. The guards told Abdul-Rahman to rest for two minutes, and then a female nurse was brought in to re-insert the tube. The next day, the guards brought tubes that clearly had been used, and were filled with blood and bile. According to Abdul-Rahman, the guards laughed at their horror and said simply "it's your stomach."

29.    Abdul-Rahman indicated that some of the detainees being force-fed were on the verge of death, weighing only eighty to eighty-five pounds and still losing weight, even with medical intervention. He said he believed approximately 25

Cleared by DoD for Public Filing
Protected Information redacted in black
October 14, 2005

individuals were currently being force-fed by the military and that they all would die in time because the NG tubes the military is using are inadequate to sustain life.

30.    Abdul-Rahman also told us of the psychological torment that is taking place at Guantánamo.  He told us of his determination to die and said that "now, after four years in captivity, life and death are the same."

31.    Abdul-Rahman – who, at age 31 is older than most of our clients – described his perspective on what has caused the despondency at Guantánamo to peak to such a level that detainees are willing to die:  "These [detainees] are young.  They are innocent.  The United States thought they had information.  These people don't have information.  Now, the situation is more severe.  It has been four years now.  People on this island have lost trust in any human being.  In the beginning the interrogators used to say 'trust us'.  Delegations from other countries said 'trust us'.  All the promises we've been given are lies.  We lost trust."  He echoed the sentiment we heard from all of our desperate and despondent clients:  "there is no law here, only injustice."

32.    I declare, under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 13th day of October 2005
New York, New York

                                        /s/
                                        Julia Tarver

11