IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDUL RAHMAN,                          )
                                       )
                                       )
            Petitioner,                )
                                       )
      v.                               )        Civil Action No. 05-0994 (JDB)
                                       )
GEORGE W. BUSH, *et al.,*              )
                                       )
            Respondents.               )
_____)

## DECLARATION OF TERESA A. McPALMER

Pursuant to 28 U.S.C. § 1746, I, Commander Teresa A. McPalmer, Judge Advocate General's Corps, United States Navy, hereby state that to the best of my knowledge, information, and belief, the following is true, accurate and correct:

1.      I am the Legal Advisor to the Office for the Administrative Review of the Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba (OARDEC). In that capacity I am an advisor to the Director, Combatant Status Review Tribunals.

2.      I hereby certify that the documents attached hereto constitute a true and accurate copy of the portions of the record of proceedings before the Combatant Status Review Tribunal related to petitioner Abdul Rahman that are suitable for public release. The portions of the record that are classified or considered law enforcement sensitive are not attached hereto or were redacted by an OARDEC staff member. This staff member also redacted information that would personally identify certain U.S. Government personnel in order to protect the personal privacy and security of those individuals.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  7 April 2006                          Teresa A. McPalmer
                                              CDR, JAGC, U. S. Navy



# Department of Defense
## Director, Combatant Status Review Tribunals

OARDEC/Ser: 936

FOR OFFICIAL USE ONLY

1 7 FEB 2005

From:  Director, Combatant Status Review Tribunal

Subj:  **REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 675**

Ref:  (a) Deputy Secretary of Defense Order of 7 July 2004
      (b) Secretary of the Navy Order of 29 July 2004

1.  I concur in the decision of the Combatant Status Review Tribunal that Detainee ISN #675 meets the criteria for designation as an Enemy Combatant, in accordance with references (a) and (b).

2.  This case is now considered final and the detainee will be scheduled for an Administrative Review Board.

J. M. McGARRAH
RADM, CEC, USN

Distribution:
NSC (Mr. John B. Wiegmann)
DoS (Ambassador Prosper)
DASD-DA
JCS (J5)
SOUTHCOM (CoS)
COMJTFGTMO
OARDEC (Fwd)
CITF Ft Belvoir

FOR OFFICIAL USE ONLY

14 Feb 05

MEMORANDUM

From: Legal Advisor
To:    Director, Combatant Status Review Tribunal

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
       FOR DETAINEE ISN #675

Ref:   (a) Deputy Secretary of Defense Order of 7 July 2004
       (b) Secretary of the Navy Implementation Directive of 29 July 2004

Encl:  (1) Appointing Order for Tribunal #27 of 9 December 2004
       (2) Col. ███████ E-mail of 25 January 2005
       (3) Record of Tribunal Proceedings

1. Legal sufficiency review has been completed on the subject Combatant Status Review
Tribunal in accordance with references (a) and (b). After reviewing the record of the Tribunal, I
find that:

    a. The detainee was properly notified of the Tribunal process and elected to participate.

    b. The Tribunal was properly convened and constituted by enclosure (1).

    c. The Tribunal substantially complied with all provisions of references (a) and (b).
    Note that the Tribunal Decision Report does not include a classified decision report. I
    confirmed with the Tribunal President that the Tribunal found all the classified evidence
    persuasive of the detainee's status as an enemy combatant. *See* enclosure (2).

    d. The detainee requested one witness and his passport as evidence. The Tribunal
    President found both to be relevant. The Tribunal forwarded a request to the Government
    of Afghanistan through the U.S. State Department to locate and communicate with the
    witness, but according to the State Department no response was received from the
    Government of Afghanistan. Based on the lack of a response, the Tribunal President
    determined that the witness was not reasonably available. The Tribunal also attempted to
    obtain the detainee's passport by forwarding a request to the Government of Uzbekistan
    via the State Department. Again, according to the State Department, no response was
    received. The Tribunal President determined that the passport was not reasonably
    available. In my opinion, the Tribunal President had no choice but to find the requested
    witness and document not reasonably available.

    e. The Tribunal's decision that detainee #675 is properly classified as an enemy
    combatant was unanimous.

UNCLASSIFIED

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
FOR DETAINEE ISN #675

f.  The detainee's Personal Representative was given the opportunity to review the
record of proceedings and declined to submit post-tribunal comments to the Tribunal.
*See* enclosure (5) of Record of Tribunal Proceedings.

2.  The proceedings and decision of the Tribunal are legally sufficient and no corrective action is
required.

3.  I recommend that the decision of the Tribunal be approved and the case be considered final.

JAMES R. CRISFIELD
CDR, JAGC, USN

2
UNCLASSIFIED



## Department of Defense
### Director, Combatant Status Review Tribunals

9 Dec 04

From:  Director, Combatant Status Review Tribunals

Subj:  APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #27

Ref:   (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal established by "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004 is hereby convened. It shall hear such cases as shall be brought before it without further action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

**MEMBERS:**

████████████████, Colonel, U.S. Army; President

████████████████ Lieutenant Colonel, U.S. Air Force; Member

████████████████ Lieutenant Colonel, U.S. Air Force; Member (JAG)

J. M. McGARRAH
Rear Admiral
Civil Engineer Corps
United States Navy

Encl (1)

**Crisfield, James R (N3N5LD)**

| | |
|---|---|
| From: | ████████████████████ |
| Sent: | Tuesday, January 25, 2005 7:42 AM |
| To: | 'Crisfield, James R (N3N5LD)' |
| Subject: | RE: ISN 675 |

Classification: U N C L A S S I F I E D
Caveats: FOUO

CDR Crisfield,

Based on your definition, the Tribunal found all of the classified evidence
in ISN 675's case to be persuasive and supportive of the determination of
this Detainee's status as an enemy combatant.

████████████

Classification: U N C L A S S I F I E D
Caveats: FOUO

1

Encl (2)



# HEADQUARTERS, OARDEC FORWARD
GUANTANAMO BAY, CUBA
APO AE 09360

14 January 2005

MEMORANDUM FOR DIRECTOR, CSRT

FROM: OARDEC FORWARD Commander ICO ISN 675

1. Pursuant to Enclosure (1), paragraph (I)(5) of the *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba* dated 29 July 2004, I am forwarding the Combatant Status Review Tribunal Decision Report for the above mentioned ISN for review and action.

2. If there are any questions regarding this package, point of contact on this matter is the undersigned at DSN ████████

CHARLES E. JAMISON
CAPT, USN

SECRET//NOFORN//X1

(U) __Combatant Status Review Tribunal Decision Report Cover Sheet__

(U) This Document is UNCLASSIFIED Upon Removal of Enclosures (2) and (4).

(U) TRIBUNAL PANEL:    #27

(U) ISN#:    675

Ref:    (a) Convening Order for Tribunal #27 of 9 December 2004 (U)
        (b) CSRT Implementation Directive of 29 July 2004 (U)
        (c) DEPSECDEF Memo of 7 July 2004 (U)

Encl:   (1) Unclassified Summary of Basis for Tribunal Decision (U/FOUO)
        (2) Classified Summary of Basis for Tribunal Decision (N/A)
        (3) Summary of Detainee/Witness Testimony (U/FOUO)
        (4) Copies of Documentary Evidence Presented (S/NF)
        (5) Personal Representative's Record Review (U)

(U) This Tribunal was convened on 22 December 2004 by references (a) and (b) to make a determination as to whether the detainee meets the criteria to be designated as an enemy combatant as defined in reference (c).

(U) The Tribunal has determined that Detainee #675 is properly designated as an enemy combatant as defined in reference (c).

(U) In particular, the Tribunal finds that this detainee supported the Taliban and is a member of the Islamic Movement of Uzbekistan (IMU), an associated force that has engaged in hostilities against the United States or its coalition partners, as more fully discussed in the enclosures.

(U) Enclosure (1) provides an unclassified account of the basis for the Tribunal's decision.  A detailed account of the evidence considered by the Tribunal and its findings of fact are contained in enclosure (1).

Colonel, U.S. Army
Tribunal President

UNCLASSIFIED/FOUO

# UNCLASSIFIED SUMMARY OF BASIS FOR TRIBUNAL DECISION

### (Enclosure (1) to Combatant Status Review Tribunal Decision Report)

TRIBUNAL PANEL: _____#27___
ISN #: _____675___

## 1. Introduction

As the Combatant Status Review Tribunal Decision Report indicates, the Tribunal has determined that this detainee supported the Taliban and is a member of the Islamic Movement of Uzbekistan (IMU), an associated force that has engaged in hostilities against the United States or its coalition partners, as more fully discussed in the enclosures. In reaching its conclusions, the Tribunal considered both classified and unclassified information. The following is an account of the unclassified evidence considered by the Tribunal. Due to the preponderance of the unclassified evidence and the Detainee's own written and oral testimony, which was supported by the classified evidence, there will be no classified summary Enclosure (2).

## 2. Synopsis of Proceedings

The unclassified evidence presented to the Tribunal by the Recorder indicated that the Detainee is associated with the Taliban. The Detainee arrived in Afghanistan in May/June 2000 from Uzbekistan via Tajikistan. The Detainee completed military training in Tajikistan. The Detainee received weapons training on the AK-47 rifle, rocket-propelled grenade launcher, and PK machine gun. The Detainee fought with the Islamic Movement of Uzbekistan. The Islamic Movement of Uzbekistan is a terrorist organization fighting with the Taliban in Afghanistan. The Detainee met with a particular individual in Kabul, to whom he gave his passport. This individual is the leader of the Islamic Movement of Uzbekistan. The Detainee participated in military operations against the coalition. The Detainee was captured in Afghanistan with a weapon and ammunition. The Detainee fought in Afghanistan.

The Detainee participated actively in the Tribunal proceeding and made a sworn statement, as well as submitting a written statement, each responding to the allegations on the Unclassified Summary of Evidence. In short, the Detainee admitted sufficient facts to confirm his status as an enemy combatant.

The Detainee chose to participate in the Tribunal process. He called one witness and requested one document be produced. The Tribunal President approved one witness and found that the approved witness was not reasonably available, and that alternative means of producing the witness's testimony were also not reasonably available. The Tribunal President ordered the unclassified document requested by the detainee to be produced although the State Department was unable to produce this document. The Tribunal President's evidentiary and witness rulings are explained below.

UNCLASSIFIED/FOUO

UNCLASSIFIED/FOUO

### 3. Evidence Considered by the Tribunal

The Tribunal considered the following evidence in reaching its conclusions:

      a. Exhibits: D-a and D-b, R-1 through R-16.

      b. Testimony of the following persons: none.

      c. Sworn statement of the detainee

### 4. Rulings by the Tribunal on Detainee Requests for Evidence or Witnesses

The Detainee requested the following witnesses be produced for the hearing:

| Witness | President's Decision | Testified? |
|---|---|---|
| Commander Abjulmumin | not reasonably available | no* |

* The Detainee offered that this witness would testify that the Detainee willingly surrendered himself. As such the assigned Tribunal president at that time determined that this testimony could be relevant and was therefore approved. A request to obtain this witness testimony was sent to the U.S. Department of State on 26 November 2004 with follow-ups on 10 December 04 and 17 December 04. To date, the Department of State has indicated they have had no response back from the Foreign Embassy. As such, the Tribunal President determined that based on the attempt to locate and the lack of response, this witness was not reasonably available.

The Detainee requested that the following evidence be produced:

| Evidence | President's Decision | Produced? |
|---|---|---|
| passport | not reasonably available | no* |

* The Detainee requested that his passport be obtained from the Uzbekistan government. The assigned Tribunal president at that time approved this request. A request to obtain this document was sent to the U.S. Department of State on 26 November 2004 with follow-ups on 10 December 04 and 17 December 04. To date, the Department of State has indicated they have had no response back from the Foreign Embassy. As such, the Tribunal President determined that based on the attempt to locate and the lack of response, this document was not reasonably available.

### 5. Discussion of Unclassified Evidence

The Tribunal considered the following unclassified evidence in making its determinations:

UNCLASSIFIED/FOUO

UNCLASSIFIED/FOUO

a. The recorder offered Exhibits R-1 and R-2 into evidence during the unclassified portion of the proceeding. Exhibit R-1 is the Unclassified Summary of Evidence. While this summary is helpful in that it provides a broad outline of what the Tribunal can expect to see, it is not persuasive in that it provides conclusory statements without supporting unclassified evidence. Exhibit R-2 is the Department of Homeland Security Terrorist Organization Reference Guide; it highlights that the Islamic Movement of Uzbekistan (IMU) is a designated foreign terrorist organization, but provided no usable evidence. Accordingly, the Tribunal also reviewed the classified exhibits for support of the Unclassified Summary of Evidence.

b. Essentially the only unclassified evidence the Tribunal had to consider was the Detainee's written statement (Exhibit D-b) and his sworn testimony. A summarized transcript of the Detainee's sworn testimony is attached as CSRT Decision Report Enclosure (3). A copy of the Detainee's written statement is attached as Exhibit D-b. In sum, the Detainee admitted that he supported the Taliban and was a member of the Islamic Movement of Uzbekistan (IMU). The Detainee admitted fleeing Uzbekistan to Tajikistan in August of 1999 when a friend who was using the Detainee's car and identification murdered a police officer and left the Detainee's identification at the scene. While in Tajikistan, the Detainee met an Islamic Movement of Uzbekistan (IMU) representative who confiscated his military identification card and took him to an auto shop compound, which held many "newcomers." During his stay, the Detainee admitted being trained on and firing an AK-47. The Detainee admitted traveling with the IMU to a mountain region near Kyrgyzstan to join the "battlefront," but claims he never made it due to an illness. The Detainee claims he was treated in an IMU hospital for 7 months. After his recovery, the Detainee stated he and others were transported by Russian soldiers into Afghanistan. Initially arriving in Mazar-e-Sharif, the Detainee claims after one week, he and 5-6 others were transferred to an auto shop compound in Kabul. While in Kabul, the Detainee admitted to driving an ambulance for the IMU. The Detainee claimed that he made several unsuccessful attempts to regain his military ID and money to return to Uzbekistan because he was homesick. Desperate, the Detainee claims he ran away and was captured by the IMU between Kabul and Mazar-e-Sharif. In order to secure his release, the Detainee agreed to go to the front line in the Dashti Archi district of Kunduz City and help with miscellaneous chores for a month or so. When the U.S. bombardment began, the Detainee was handed an AK-47 weapon. When the IMU retreated, the Detainee claims he voluntarily surrendered to the US Alliance Commander Abdul Munin in Dashti Archi's Mulla Quli village.

c. In his closing comments, the Detainee stated he did not want to be returned to his native Uzbekistan, because of the false "criminal" (aka murder) charges against him and that he feared for his life.

The Tribunal found the Detainee's admission that he joined the IMU and supported their (and the Taliban's) efforts in Afghanistan at the frontlines sufficient to confirm his status as an enemy combatant because he supported the Taliban and was a member of the Islamic Movement of Uzbekistan (IMU), an associated force that has engaged in hostilities against the United States and its coalition partners (see Exhibit R-2). The fact

UNCLASSIFIED/FOUO

that the Detainee was subsequently incarcerated by the IMU does not detract from his status as an enemy combatant because he voluntarily agreed to go to the frontlines in Afghanistan to get out of jail. Due his criminal record in Uzbekistan, he joined the IMU to avoid returning to his own country and appeared less concerned with their ideological beliefs. The tribunal also considered the classified evidence. The documents did not include any information that would change the findings of any member of the tribunal. Given the Detainee's admissions during his testimony, and the classified exhibits, the Tribunal found the evidence overwhelming that the detainee is properly classified as an enemy combatant.

### 6. Consultations with the CSRT Legal Advisor

No issues arose during the course of this hearing that required consultation with the CSRT legal advisor.

### 7. Conclusions of the Tribunal

Upon careful review of all the evidence presented in this matter, the Tribunal makes the following determinations:

a. The Detainee was mentally and physically capable of participating in the proceeding. No medical or mental health evaluation was deemed appropriate.

b. The Detainee understood the Tribunal proceedings and actively participated throughout the Tribunal.

c. The Detainee is properly classified as an enemy combatant. He supported the Taliban and is a member of the Islamic Movement of Uzbekistan (IMU), an associated force that has engaged in hostilities against the United States or its coalition partners

d. Due to the preponderance of the unclassified evidence and the Detainee's own written and oral testimony, which was supported by the classified evidence, there will be no classified summary Enclosure (2).

### 8. Dissenting Tribunal Member's Report

None. The Tribunal reached a unanimous decision.

Respectfully submitted,



Colonel, U.S. Army
Tribunal President

### Summarized Detainee Statement

*The Tribunal President read the Hearing Instructions to the Detainee. The Detainee confirmed that he understood the process and had no questions.*

*The Personal Representative presented the Detainee Election Form (Exhibit D-A) to the Tribunal.*

*The Recorder presented Exhibit R-1 (the Unclassified Summary of Evidence) and Exhibit R-2 to the Tribunal.*

*The Recorder gave a brief description of the contents of the Unclassified Summary of Evidence (Exhibit R-1).*

*The Recorder confirmed that he had no further unclassified evidence or witnesses and requested a closed Tribunal session to present classified evidence.*

*Referring to Exhibit D-A, the Detainee Election Form, the Tribunal President made the following statement:*

Tribunal President: I see by the Detainee Election Form that you have elected to participate here today as evidenced by your being here. I also see that you requested to have a witness. You also requested for us to see if we could get your passport.

Detainee: I just want to let you know that I actually went to that person, not to ask for my passport, but my passport should be back in Uzbekistan.

Tribunal President: As such, based on your request we did go to our Department of State to ask for the witness and the document to be produced. They requested these things on the 26th of November with follow-ups on the 10th of December and 17th of December. To date, the Department of State has received no response back from the foreign embassy. As such, I have determined that based on the attempt to locate and the lack of response, this witness and this document at this time are not reasonably available. Should they become available at a later time, the Tribunal will consider whether to re-open your case or not. Kamalludin Kasimbekov, you may now present any evidence you have to the Tribunal and you have the assistance of your Personal Representative in doing so. Do you wish to present information to the Tribunal and would you like to make your statement under oath?

Detainee: Yes.

Tribunal President: Recorder, would you please administer the oath?

*The Recorder administered the Muslim oath to the Detainee.*

Tribunal President: You may now begin.



ISN# 675
Enclosure (3)
Page 1 of 7

Personal Representative:  First we would like to enter as an Exhibit D-B, a hand written statement by Kasimbekov.

Tribunal President:  Let's take a moment to read this.

*The Tribunal paused to read the Detainee's written statement.*

Tribunal President:  Is there anything else in addition to this written statement that you would like to tell us?

Detainee:  I just want to let you know about the item number in my summary of evidence, it is item number three which says that I received training on the AK-47 and the other two weapons.  I just want to let you know that I only trained on the AK-47.  I just saw the other two weapons at that time and I never received training on them.

*3.a.3. The Detainee received weapons training on the AK-47 rifle, rocket-propelled grenade launcher, and PK machine gun.*

Tribunal President:  Is there anything else you would like to add?

Detainee:  Item number six says that I went to the leader of the IMU and gave him my passport.  I didn't give him my passport.  I went to him to ask for my military I.D. back so I could go home.

*3.a.6. The Detainee met with a particular individual in Kabul, to whom he gave his passport.*

Detainee:  Can I take a look at the evidence?  I may have a question?  Can I have a couple of minutes to read this?

Personal Representative:  He has the Uzbek translation.

Tribunal President:  Okay, yes certainly.

*The Tribunal paused to allow the Detainee to re- read the translated version of Exhibit R-1.*

Detainee:  Okay, again about number six, I didn't give him my passport.  I just went to him to ask for my military I.D.  My passport is actually in Tajikistan.  My passport was in Uzbekistan at that time but when I was in Tajikistan, they took my military I.D.

Personal Representative:  Who are they?

Detainee:  The members of IMU.

UNCLASSIFIED//FOUO

Translator: How can I explain "coalition" to him?

Personal Representative: It's a group of, in this case countries or organizations, who support each other toward one common goal.

***The translator relayed the definition of culture to the Detainee who appeared to understand.***

Detainee:  I am concerned that my combatant status review board is a fake and it was presented to me previously.  There was a definition of what an Enemy Combatant is and it was saying that anybody who is against or participated against America or it's allies.  By that definition, I've never done anything against America and this definition is not relevant to me.  The main reason that I joined the IMU was because back in Uzbekistan my brother was jailed with false accusations.  When their representative from Uzbekistan came here to the camp I talked to them and they were also giving us all kinds of false accusations. When that delegation came back they read some sort of summary of evidence to me about my case, they read things that I had never heard of and that I never participated in.  There were all kinds of charges that I never heard of.  Even from his words, they'd be writing some notes and I noticed that they were adding lots things to it that I never talked about.

Tribunal President:  Does that conclude your statement?

Detainee:  Yes.  If there is need for me to write a statement in more detail I can.  I didn't have enough time at that moment when they gave me the piece of paper so I just wrote initial portion.

Tribunal President:  I think I speak for my fellow Tribunal Members, that I think your statement is very detailed and provides us a lot of information.  At this time though we may have some questions for you.  Would you be willing to answer some questions for us?

Detainee:  Yes.

Tribunal President:  Thank you.  Personal Representative, do you have any questions for the Detainee?

Personal Representative:  Yes ma'am I do.

Personal Representative's questions:

    Q.  There were a few things that you mentioned to me in our interview that I think is relevant to the Tribunal and therefore I'd like to ask you a few questions.  Why were the members of the IMU holding your military I.D.?

    A.  At that time between Tajikistan and Uzbekistan there was no border.  I'm not sure about right now, there may be one now but at that time they didn't have a border so everybody could easily go through from one country to another country if they had

ISN# 675<br/>
Enclosure (3)<br/>
Page 3 of 7

UNCLASSIFIED//FOUO

a passport, military I.D., or some kind of document. For that reason, if you had any kind of document, they would take that document so you won't be able to travel freely. This was to keep you there with them.

Q. You had requested a witness, Commander Aduluman (ph). What did you want to ask Commander Aduluman (ph) and why?

A. I just wanted him to confirm that I actually surrendered myself voluntarily and nobody pushed to that and that I gave him my weapon.

Q. Why did you decide to surrender to General Fahim's (ph) men?

A. The main reason was because I wanted to go back home and I thought the opportunity to surrender myself would be easier for me get home and sooner.

Q. You were captured in Mazar-e-Sharif while you were helping the IMU. Why did you agree to help the IMU?

A. I agreed to help them out because that was the way I could be released from the jail, that's why I agreed to help them. The jail was in a basement and they didn't have any kind of descent living conditions and it was very hard there. I wanted to get out of the jail and I thought would be a perfect opportunity for me to go back home after that.

Personal Representative: That's all the questions I have.

Detainee: Can I add something?

Tribunal President: Sure.

Detainee: Just for your record I want to let you know that on my previous interrogations, I never had a descent interpreters. Once they brought me two interpreters, which our languages are not even close enough to understand what I was talking about. I'm just guessing that all those items on my summary of evidence that you wrote here, could be the misunderstanding or mistranslation.

Personal Representative: I don't have anything else ma'am.

Tribunal President: Recorder, do you have any questions for the Detainee?

Recorder: No ma'am I don't.

Tribunal President: Do any Tribunal members have any questions for the Detainee?

UNCLASSIFIED//FOUO

Tribunal Members' questions:

Q. You say you have a military I.D. card, were you in the Uzbekistan military?

A. Yes.

Q. How old are you?

A. I'm now 27.  I was born in 1977 on November the 9th.

Q. Education level?

A. I graduated from 8th grade in the middle school.  Then I went to Lesay (ph) it's a kind of college level school.  I did three years at Lesay (ph).  I turned in my documents to the college but I had to leave the country at that time.

Q. How long were you in the Uzbek Army or the Uzbek military?

A. They would assign you to some kind of job and you would work there and 20% of your salary would go to the military as a donation.

Q. Did you have a particular job in the military?  Were you a cook, a soldier, or a mechanic?

A. I didn't actually work where they assigned me.  I was trading jobs.  It was like bribing them.  You give them money so they don't bother you.

Q. You said you were jail.  Where were you in jail?

A. In Afghanistan, IMU members actually put me in jail.

Q. Are you having any problems with the translator today?

A. No no no.

Q. Have you been back to Uzbekistan since 1999?

A. No.

Q. Do you believe that you are wanted for the policemen's murder?  (Referring to information stated in Exhibit D-B)

A. When the representative from Uzbekistan came here, they gave me a summary of evidence and read me some charges.  I was totally shocked hearing those kinds of things because it never happened.

UNCLASSIFIED//FOUO

Q.   But the Uzbek representative did accuse you of that?

A.   Yes.

Tribunal President's questions:

Q.   I know in your statement you said that after the U.S. started bombing in Afghanistan is when you decided to leave?  When approximately did you surrender?

A.   It was about four or five days before Ramadan.  I'm not sure about the date but I'm sure it was right before Ramadan.  It was approximately four or five days before.

Q.   Were you by yourself or did you surrender with a group?

A.   When I came to that place I saw lots of people over there, other people who had come to surrender.

Q.   Other IMU members?

A.   Some Pakistani people, I saw one Arab, and one other person who is actually here at this moment.  He speaks Russian.

Q.   When you surrendered to them, what did they tell you?

A.   They let me go but I was staying with them.  They told me not to go far, but to stay around them.

Q.   Did they promise you that they would try to help you get home?

A.   They just promise me but they even told me that I could just leave right then if I wanted to but I didn't want to go through Tajikistan because I didn't know that particular (area) and didn't know what to do there.

Q.   So I guess the follow on question is how did you end up here in Cuba?

A.   I believe American intelligence somehow found out that there were lots of people on that side and they came to get us.  I believe the date was May 1st.

Tribunal President:  I'd like to thank you for participating in this Tribunal today. Kamalludin Kasibekov, do you have any other thing you would like to tell this Tribunal at this time?

Detainee:  No, that is pretty much it.

ISN# 675
Enclosure (3)
Page 6 of 7

UNCLASSIFIED//FOUO

*The Tribunal President confirmed with the Personal Representative that he had no further evidence and that the Detainee no previously approved witnesses to present to the Tribunal.*

*The Tribunal President explained the remainder of the Tribunal process to the Detainee and adjourned the open session.*

*As the open session was being adjourned the Detainee asked the following question:*

Detainee:  I have one question.

Tribunal President:  Certainly.

Detainee:  If the Tribunal determines me as a Non-Enemy Combatant, you said that you are going to send me back to my homeland but in Uzbekistan as you know I may be jailed again because of all the false accusations against me.  That is not the place for me to go back to.

Tribunal President:  I'll tell you that we don't make that determination.  The only thing that we consider is whether you are an Enemy Combatant or not and then the Department of State works to decide where you are actually released to.


## AUTHENTICATION


I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.



Colonel, USA
Tribunal President

# DETAINEE ELECTION FORM

**Date:** 06 November 2004

**Start Time:** 1410

**End Time:** 1540

**ISN#:** _____ 675 _____

**Personal Representative:** ▆▆▆▆▆▆▆▆▆ Major, USAF
**(Name/Rank)**

**Translator Required?** YES          **Language?** _____ UZBEK _____

**CSRT Procedure Read to Detainee or Written Copy Read by Detainee?** YES

------------------------------------------------------------------------

## Detainee Election:

[X]    **Wants to Participate in Tribunal**

[ ]    **Affirmatively Declines to Participate in Tribunal**

[ ]    **Uncooperative or Unresponsive**

## Personal Representative Comments:

Detainee #675 was briefed on the CSRT process and he acknowledged that he understood it.  The detainee was very cooperative and eager to listen.

Detainee #675 stated that he has a concern that some earlier translators have not accurately translated his statements and he believes there is some confusion with his case file.  He has asked to speak at his Tribunal to clarify some of the things about his case.  For example, during an interrogation he stated that he had worked in a car repair shop and he heard the translator say that he had worked in a weapons repair shop.

Detainee #675 would like to call a witness from Afghanistan to testify that he willingly surrendered himself.  He also would like the US to contact the Uzbekistan government to see if they have his passport.  He believes the passport is in their possession, not in Afghanistan as the unclassified summary stated.

Personal Representative: ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

Exhibit D-a

**UNCLASSIFIED**

**Combatant Status Review Board**

TO: Personal Representative

FROM: OIC, CSRT (27 October 2004)

Subject: Summary of Evidence for Combatant Status Review Tribunal – KASIMBEKOV, Kamalludin.

1. Under the provisions of the Secretary of the Navy Memorandum, dated 29 July 2004, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base Cuba*, a Tribunal has been appointed to review the detainee's designation as an enemy combatant.

2. An enemy combatant has been defined as "an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."

3. The United States Government has previously determined that the detainee is an enemy combatant. This determination is based on information possessed by the United States that indicates that the detainee is associated with the Taliban and participated in military operations against the United States and its coalition partners.

   a. The detainee is associated with the Taliban:

      1. The detainee arrived in Afghanistan in May/June 2000 from Uzbekistan via Tajikistan.

      2. The detainee completed military training in Tajikistan.

      3. The detainee received weapons training on the AK-47 rifle, rocket-propelled grenade launcher, and PK machine gun.

      4. The detainee fought with the Islamic Movement of Uzbekistan.

      5. The Islamic Movement of Uzbekistan is a terrorist organization fighting with the Taliban in Afghanistan.

      6. The detainee met with a particular individual in Kabul, to whom he gave his passport.

      7. This individual is the leader of the Islamic Movement of Uzbekistan.

   b. The detainee participated in military operations against the coalition.

      1. The detainee was captured in Afghanistan with a weapon and ammunition.

      2. The detainee fought in Afghanistan.

**UNCLASSIFIED**

Page _____1_____ of ___2___

Exhibit ___R-1___

**UNCLASSIFIED**

4. The detainee has the opportunity to contest his designation as an enemy combatant. The Tribunal will endeavor to arrange for the presence of any reasonably available witnesses or evidence that the detainee desires to call or introduce to prove that he is not an enemy combatant. The Tribunal President will determine the reasonable availability of evidence or witnesses.


*UNCLASSIFIED*



**U.S. Department of Homeland Security**
**U.S. Customs and Border Protection**
**Office of Border Patrol**

> **NOTE:** This report is based upon information obtained from various open sources. No classified information was used in the preparation of this report.

f Border Patrol
624 SSG Sims Road,
AF,
, TX 79908
Address: Attn. BPSCC P.O. Box 6017
, Texas 79906
ent D. Thew
5) 724-3218

# Terrorist Organization Reference Guide

**January 2004**

*UNCLASSIFIED*

Page __1__ of __5__        Exhibit __R-2__

*UNCLASSIFIED*

## Table of Contents

Designated Foreign Terrorist Organizations ......................................................1
1. Abu Nidal organization (ANO) ...............................................................2
2. Abu Sayyaf Group (ASG) .....................................................................3
3. Al-Aqsa Martyrs Brigade ....................................................................4
4. Armed Islamic Group (GIA) ..................................................................5
5. 'Asbat al-Ansar ............................................................................5
6. Aum Supreme Truth (Aum) Aum Shinrikyo, Aleph .............................................6
7. Basque Fatherland and Liberty (ETA) ......................................................7
8. Communist Party of Philippines/New People's Army (CPP/NPA) ...............................8
9. Al-Gama'a al-Islamiyya (Islamic Group, IG) ...............................................9
10. HAMAS (Islamic Resistance Movement) .....................................................10
11. Harakat ul-Mujahidin (HUM) ..............................................................11
12. Hizballah (Party of God) ................................................................13
13. Islamic Movement of Uzbekistan (IMU) ....................................................14
14. Jaish-e-Mohammed (JEM) ...................................................................15
15. Jemaah Islamiya (JI) ....................................................................16
16. Al-Jihad (Egyptian Islamic Jihad) .......................................................17
17. Kahane Chai (Kach) ......................................................................18
18. Kurdistan Workers' Party (PKK, KADEK) ...................................................18
19. Lashkar-e-Tayyiba (LT) ..................................................................20
20. Lashkar I Jhangvi (LJ) ..................................................................21
21. Liberation Tigers of Tamil Eelam (LTTE) .................................................22
22. Mujahedin-e Khalq Organization (MEK or MKO) .............................................23
23. National Liberation Army (ELN) - Colombia ...............................................24
24. Palestine Islamic Jihad (PIJ) ...........................................................25
25. Palestine Liberation Front (PLF) ........................................................26
26. Popular Front for the Liberation of Palestine (PFLP) ....................................26
27. Popular Front for the Liberation of Palestine - General Command (PFLP-GC) ....27
28. Al-Qaeda ................................................................................28
29. Real IRA (RIRA) .........................................................................29
30. Revolutionary Armed Forces of Colombia (FARC) ..........................................30
31. Revolutionary Nuclei ....................................................................31
32. Revolutionary Organization 17 November (17 November) ....................................32
33. Revolutionary People's Liberation Party/Front (DHKP/C) ..................................33
34. Salafist Group for Call and Combat (GSPC) ..............................................34
35. Sendero Luminoso (Shining Path or SL) ...................................................35
36. United Self-Defense Forces/Group of Colombia (AUC) .....................................36
Other Foreign Terrorist Organizations ......................................................39
37. Al-Badhr Mujahedin (al-Badr) ............................................................40
38. Alex Boncayao Brigade (ABB) .............................................................40
39. Al-Ittihad al-Isiami (AIAI) .............................................................41
40. Allied Democratic Forces (ADF) ..........................................................42
41. Ansar al-Islam (Iraq) ...................................................................42
42. Anti-Imperialist Territorial Nuclei (NTA) ...............................................43

i



43. Army for the Liberation of Rwanda (ALIR) ............................................44
44. Cambodian Freedom Fighters (CFF) .................................................45
45. Communist Party of Nepal (Maoist)/ United People's Front ...............46
46. Continuity Irish Republican Army (CIRA) ..........................................47
47. Eastern Turkistan Islamic Movement (ETIM) ....................................47
48. First of October Antifascist Resistance Group (GRAPO) ..................48
49. Harakat ul-Jihad-I-Islami (HUJI) ......................................................49
50. Harakat ul-Jihad-I-Islami/Bangladesh (HUJI-B) ...............................50
51. Hizb-I Islami Gulbuddin (HIG) ..........................................................50
52. Hizb ul-Mujahedin (HM) ...................................................................51
53. Irish Republican Army (IRA).............................................................52
54. Islamic Army of Aden (IAA) ..............................................................53
55. Islamic International Peacekeeping Brigade (IIPB) ..........................54
56. Jamiat ul-Mujahedin (JUM) ..............................................................55
57. Japanese Red Army (JRA) ...............................................................55
58. Kumpulan Mujahidin Malaysia (KMM) ..............................................56
59. Libyan Islamic Fighting Group..........................................................57
60. Lord's Resistance Army (LRA) .........................................................58
61. Loyalist Volunteer Force (LVF) .........................................................58
62. Moroccan Islamic Combatant Group (GICM) ...................................59
63. New Red Brigades/Communist Combatant Party (BR/PCC) .............60
64. People Against Gangsterism and Drugs (PAGAD) ...........................61
65. Red Hand Defenders (RHD) .............................................................62
66. Revolutionary Proletarian Initiative Nuclei (NIPR) ...........................62
67. Revolutionary United Front (RUF)......................................................63
68. Riyadus-Salikhin Reconnaissance and Sabotage Battalion of Chechen Martyrs .64
69. Sipah-I-Sahaba/Pakistan (SSP) .......................................................65
70. Special Purpose Islamic Regiment (SPIR) .......................................65
71. The Tunisian Combatant Group (TCG) .............................................66
72. Tupac Amaru Revolutionary Movement (MRTA) ...............................67
73. Turkish Hizballah ..............................................................................68
74. Ulster Defense Association/Ulster Freedom Fighters (UDA/UFF).......68

Terrorist Exclusion List ...........................................................................71

Mexican Insurgent/Guerrilla Organizations ............................................77

End Notes ...............................................................................................84

UNCLASSIFIED

3 of 5

UNCLASSIFIED

# Designated Foreign Terrorist Organizations[1]

The following descriptive list constitutes the 36 terrorist groups that currently (as of 30 January 2003) are designated by the Secretary of State as Foreign Terrorist Organizations (FTOs), pursuant to section 219 of the Immigration and Nationality Act, as amended by the Antiterrorism and Effective Death Penalty Act of 1996. The designations carry legal consequences:

- It is unlawful to provide funds or other material support to a designated FTO.
- Representatives and certain members of a designated FTO can be denied visas or excluded from the United States.
- US financial institutions must block funds of designated FTOs and their agents and must report the blockage to the US Department of the Treasury.

## 1.    Abu Nidal organization (ANO)

**a.k.a. Fatah - the Revolutionary Council, Arab Revolutionary Brigades, Black September, and Revolutionary Organization of Socialist Muslims**

### Description

Has carried out terrorist attacks in 20 countries, killing or injuring almost 900 persons. Targets include the United States, the United Kingdom, France, Israel, moderate Palestinians, the PLO, and various Arab countries. Major attacks included the Rome and Vienna airports in December 1985, the Neve Shalom synagogue in Istanbul and the Pan Am Flight 73 hijacking in Karachi in September 1986, and the City of Poros day-excursion ship attack in Greece in July 1988. Suspected of assassinating PLO deputy chief Abu Iyad and PLO security chief Abu Hul in Tunis in January 1991. ANO assassinated a Jordanian diplomat in Lebanon in January 1994 and has been linked to the killing of the PLO representative there. Has not staged a major attack against Western targets since the late 1980s.

### Strength

Few hundred plus limited overseas support structure.

### Location/Area of Operation

Elements relocated to Iraq in December 1998, where the group maintains a presence. Has an operational presence in Lebanon including in several Palestinian refugee camps. Authorities shut down the ANO's operations in Libya and Egypt in 1999. Has demonstrated ability to operate over wide area, including the Middle East, Asia, and Europe. Financial problems and internal disorganization have reduced the group's activities and capabilities.

UNCLASSIFIED

4 OF 5

## External Aid

Receives financial, training, weapons, explosives, political, diplomatic, and organizational aid from Iran and diplomatic, political, and logistic support from Syria.

## 13.    Islamic Movement of Uzbekistan (IMU)

### Description

Coalition of Islamic militants from Uzbekistan and other Central Asian states opposed to Uzbekistani President Islom Karimov's secular regime. Although the IMU's primary goal remains to overthrow Karimov and establish an Islamic state in Uzbekistan, IMU political and ideological leader Tohir Yoldashev is working to rebuild the organization and appears to have widened the IMU's targets to include all those he perceives as fighting Islam. The IMU generally has been unable to operate in Uzbekistan and thus has been more active in Kyrgystan and Tajikistan.

### Activities

The IMU primarily targeted Uzbekistani interests before October 2001 and is believed to have been responsible for five car bombs in Tashkent in February 1999. Militants also took foreigners hostage in 1999 and 2000, including four US citizens who were mountain climbing in August 2000, and four Japanese geologists and eight Kyrgyz soldiers in August 1999. Even though the IMU's rhetoric and ultimate goals may have been focused on Uzbekistan, it was generally more active in Kyrgystan and Tajikistan. In Operation Enduring Freedom, the counterterrorism coalition has captured, killed, and dispersed many of the IMU's militants who were fighting with the Taliban in Afghanistan and severely degraded the movement's ability to attack Uzbekistani or Coalition interests in the near term. IMU military leader Juma Namangani was killed during an air strike in Afghanistan in November 2001; Yoldashev remains at large.

### Strength

Probably fewer than 1,000 militants.

### Location/Area of Operation

Militants are scattered throughout South Asia, Tajikistan, and Iran. Area of operations includes Afghanistan, Iran, Kyrgyzstan, Pakistan, Tajikistan, and Uzbekistan.

### External Aid

Support from other Islamic extremist groups and patrons in the Middle East and Central and South Asia.

14

UNCLASSIFIED
5 of 5

**Жангчи статусни қайта кўриб чиқиш кенгаши**

Шахсий Вакилга

Ҳукумат Вакилидан (27 Октябрь 2004)

Мавзу – Жангчи статусни қайта кўриб чиқиш Суд учун исбот-далилларнинг қисқача мазмуни – КАСИМБЕКОВ, Комолидин.

1. 2004 йил 16-Июль билан саналанган Ҳарбий денгиз флоти департмент бўлими баённомасининг талабларига биноан – **Кубадаги Гвантанамо Курфази Ҳарбий Базасида Ушлаб Қолинган Душман Жангчиларга нисбатан жангчи статусни қайта кўриб чиқиш Судни Амалларини Ижро Қилиш** – Трибунал, ушлаб олинганларни душман жангчиси деб белгиланганини (аниқланганини) қайта кўриб чиқиш учун тайинланган.

2. Америка Қўшма Штатлари ва унинг иттифоқдошларига қарши жанг қилган Толибон ёки Ал Қойда, ва уларга қўшилган кучларнинг аъзоси бўлган ёки уларга ёрдам берганлар, душман жангчиси деб ҳисобланади. Бунинг ичига жанг қилганлар ва уларга тўғридан тўғри ёрдам берган ҳамма инсонлар киради.

3. АҚШ ҳукумати ушлаб олинган инсонни душман жангчиси деб олдиндан аниқлаган. Бу аниқлаш АҚШнинг қўлидаги маълумотдан келиб чиқади ва бу маълумот ушлаб олинган инсоннинг Толибон билан қўшилганини ва Америка Қўшма Штатлари ва унинг коалиция иттифоқдошларига қарши ҳарбий амалиётларда иштирок этганини кўрсатади.

   a. Ушлаб олинган инсон Толибон билан қўшилган:
      1. Ушлаб олинган инсон Май ёки Июнь ойида 2000 йилда Ўзбекистондан, Тожикистон орқали Афғонистонга етиб келди.
      2. Ушлаб олинган инсон Тожикистонда ҳарбий машқ тугатди.
      3. Ушлаб олинган инсон АК–47 милтиғи, граната учирадиган ракета отувчи, ва ПК пулемёти бўйича машқ олди.
      4. Ушлаб олинган инсон Ўзбекистоннинг Исломий Ҳаракати билан (тарафида) жанг қилди.
      5. Ўзбекистоннинг Исломий Ҳаракати Афғонистонда Толибон билан (тарафида) жанг қиладиган террористик ташқилоти.
      6. Ушлаб олинган инсон Қабулда алохида бир шахс (инсон) билан учрашди. Ушлаб олинган инсон унга паспортини берди.

7. Бу инсон Ўзбекистоннинг Исломий Ҳаракатининг
   бошлиғи.
   b. Ушлаб олинган инсон коалицияга қарши ҳарбий амалиётларда
   иштирок этди.
      1. Ушлаб олинган инсон Афғонистонда қурол ва ўқ–дори
        билан қўлга олинган.
      2. Ушлаб олинган инсон Афғонистонда жанг қилди.

4. Ушлаб олинган одам ўзини душман жангчиси деб аниқланганини мунозара
   қилиш учун имконияти бўлади.  Трибунал, иштироқ этиши мумкин бўлган
   гувоҳларни келтиришга харакат қилади. Ҳамда, ушлаб олинган инсон
   душман жангчиси эмаслигини исбот қиладиган далилларни келтиришга
   имконият беради. Исбот ёки гувоҳларни мумкин бўлган даражада иштироқ
   этишини Суд Раҳбари қарор қилади.



Kamoliddin Tohirjonovich Kacimbekov's statement.


In the beginning of August 1999, in Tashkent, my friend Abdurouf, wanted to
borrow my car for a short period of time. I gave it to him and waited for him near the
hospital of Tashkent medical institute. He came vary late around 10-11 at night. He called
me from the car, without getting off. I set in the car and He drove the car for about a half
in hour through the beltway in to vineyard. I was wondering that He didn't say a word
while driving. Later He told me that my passport, driver's license and registration (could
be a title) are gone and where He left them. When He was giving a ride to His friends,
who are in inquiry (wanted), police stopped Him and asked for documents. When police
realized that documents are do not belong to Abdurouf, He wanted to repossess the car.
At that moment His friends got scared and they killed the police. My documents were
with that policeman and Abdurof left His friends and came back to me. I had my military
ID with me. Than Abdurouf apologized to me and requested that I'll go with Him to
Kazakstan. Involuntarily I had to leave. In Kazakstan I stayed approximately 1 week.
Than during one day, Abdurouf got the address of some place from His friends and we
left with Him towards that address. We came back to Tashkent, went to the South Station
and left to Yangier by bus. From there we went to Leninobod, city in Tajikistan and then
to Dushanbe city by taxi. Than by minivan we travel to Tajik opposition and met with the
IMU representative. After one day we travel to Hoyit by a hitch hiking truck. I came to
Hoyit. There, another person took my military ID and asked me several questions about
myself. Then He took only me to the place in Hoyit, which previously belong to some
auto shop and was surrounded by wall. People of all kind off ages were there and they
were also newcomers. I stayed at that place 1 week. During that week I received training
on the AK-47 rifle and shoot 10 bullets for practice only. I also saw grenade launcher and
PK gun machine there, but we didn't have training on them.  After about 1 week or 10
days, truck came and at nighttime we drove for a 1 or 2 hours and came to Tajikistan

UNCLASSIFIED /S///

mountainous area near the border of Kyrgyzstan. After one day with ammunitions we walked up to the mountains 1 day and down 1day. And came to the Batkent region of Kyrgyzstan. If you walk another half a day from that place, you would've end up at the battlefront (for reason to cross to Uzbekistan) of IMU. I didn't go there. I left behind. I was having problems with my health. 1 month later I took care of (improved) my health and went back to Tajikistan again. I came to the Lojir village of Tajikistan. At that place IMU had a hospital. There I was getting treatment for about 7 month or so. Then, truck came and took us all. On the way other cars, trucks, busses joined us (in month of May) and we all went (came) to the border of Afghanistan through (via) the city Kulob of Tajikistan. Then Tajik government and Russian army by helicopter and ship transported us to Afghanistan. Then on our trucks again we came to city Kunduz, Afghanistan. We stayed 1 day there and than left to city Masar-E-Sharif. After staying in Masar-E-Sharif for about 1week, me and 5-6 other people were transported to city Kabul by airplane. In Kabul they placed me to work at auto shop on Vazir Akbarhon street or region. That auto shop belongs to IMU and after working there for some period of time I've been appoint to drive the IMU's ambulance. In the year of 2001, because I've missed my home and my parents, I went to the leader of IMU and ask permition to go home and also for my military ID and money. After the third time, still not getting result, I borrowed approximately $80 from my friends and runaway, because anyone who decides to live that place for good will be jailed. While riding a minivan taxi from Kabul through Masar-E-Sharif in order to get to Uzbekistan, I've been captured and jailed for 6 month by people from IMU between Kabul and Masar-E-Sharif. I've been released on September 16th 2001 with agreement that I will help in a battle. I came to the front line in Dashti Archi district of Kunduz city and was helping with all kind of household work for about a month or so. In 2001 US bombarded those places and because of lots of dead bodies they gave me AK-47 weapon. IMU retreat front line. I didn't follow them. I went to the US Alliance commander Abdul Mumin in Dashti Archi's Mulla Quli village and turn in my weapon. There were no bullets shot from my weapon.

P.S. Because of time, months and days might not be very accurate.

UNCLASSIFIED//FOUO

## Personal Representative Review of the Record of Proceedings

I acknowledge that on 30 December 2004 I was provided the opportunity to review the record of proceedings for the Combatant Status Review Tribunal involving ISN #675.

▓▓▓ have no comments.

\_\_\_ My comments are attached.

▓▓▓▓▓▓▓▓▓ Maj, USAF _____          30 Dec 2004
Name                                        Date

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Signature

ISN #675
Enclosure (5)

UNCLASSIFIED//FOUO